We'll hear argument next, this morning, in Case 12-207, Maryland v. King. Ms. Winfrey. Mr. Chief Justice, and may it please the Court, since 2009, when Maryland began to collect DNA samples from arrestees charged with violent crimes and burglary, there have been 225 matches, 75 prosecutions, and 42 convictions, including that of Respondent King. Well, that's really good. I'll bet you if you conducted a lot of unreasonable searches and seizures, you'd get more convictions, too. That proves absolutely nothing. Well, I think, Justice Scalia, it does, in fact, point out the fact that the statute is working, and in the State's view, the act is constitutional. So that's its purpose, to enable you to identify future criminals, the perpetrators of future crimes. That's the purpose of it? I thought that that wasn't the purpose set forth in the statute. No. Not just to identify people. The purpose of the statute is to enable the State to identify perpetrators of serious crimes and to use the information to make bail determinations for people who are validly in their custody. I'm having a hard time understanding the bail argument, because in my time, most of my time was in the time of arrest. And here, the arrest was in April, and the results didn't come up until August. That's true, Justice Sotomayor. And he had been retained anyway, correct? He was detained anyway. And there might be a case where someone's gotten out, but it would be the rare case. Well. You don't use it routinely for the bail determination. At this point, you're absolutely correct, Justice Sotomayor. We don't use it routinely for a couple of reasons. For one, as in Mr. King's case, there has been, in the past, a more substantial delay in getting those results back. Our lab now is getting results between 11 and 17 days. Now, that, of course, is the same. Well, that doesn't include the time to collect the sample, send it to you, or the time to do the match. It's just to do the genome mapping, correct? No, that's for the whole process, Justice Sotomayor. It's for getting the sample and getting it into the system, the DNA profile, and getting the match back. That's what we're being told. It's from 11 to 17 days. Now, of course, that wouldn't be timely for that first bail determination, but the State, under Maryland's procedures, certainly has the ability to go back to the judge and ask that sentence or that, I'm sorry, that bail determination to be modified. And in point of fact, though, we don't have any particular statistics in Maryland. In California's amicus brief, which was joined by the 49 other States and D.C. and Puerto Rico, they actually do cite two particular examples where two people, Castillo and Shamblin, were arrested. One was arrested on a credit card charge and another on a drug charge. Mr. Castillo was actually released on OR, and when his sample was matched, it came back to an unsolved rape and sodomy, and his OR was revoked. In Mr. Shamblin's case, he was granted diversion because his drug charge was a relatively low-level offense. And when the match came back, it tied him to a rape and murder. His diversion was revoked, and he's currently pending trial for both of those charges. Roberts. Your procedure limits the collection to certain violent offenses, right? It does, Mr. Chief Justice. But your argument would not be so limited, would it? Under your theory, there's no reason you couldn't undertake this procedure with respect to anybody pulled over for a traffic violation. Well, in Maryland, it's not just the fact that we have those violent crimes and burglaries. Our actually, we don't collect DNA unless someone's physically taken into custody. Now, with respect to that. Well, I understand, but there's no reason you couldn't, right? I gather it's not that hard. Police officers would give breathalyzer tests. They can also take a Q-tip or whatever and get a DNA sample, right? Well, what I would say to that is that with respect to a traffic stop, this Court said in Berkemer that a motorist has an expectation that a traffic stop is going to be relatively brief and temporary, that he or she will be given a citation and sent on. Well, how long does it take to undergo the procedure, you know, say, ah, and then you know. It doesn't take long, but what I was suggesting is that because of the nature of a traffic stop, this Court might well decide that a motorist has a reasonable expectation of privacy, not to. How about a Terry stop? A Terry stop. In a Terry stop, well, this Court, I guess we would look at two, one case in particular, this Court's case, decision in Hayes v. Florida. That involved a defendant who was taken into custody, so his, he was not arrested, but taken into custody for, to get his fingerprints, and this Court held that that was not constitutional. But the Court further said that there could be a circumstance in a Terry stop if the officer had reasonable suspicion to believe that the individual was. Ginsburg. But these are all cases, I mean, the dominant use is to solve what they call cold, cold cases, and you gave one example, this case is another, a rape committed 6 years before, right? And there was no reasonable suspicion, there was no nothing, right? And the suspicion comes up only because the DNA sample comes back as a match. So there's the, this is a very reliable tool, but it's not based on any kind of suspicion of the individual who's being subjected to it, right? That's correct, Your Honor. Now, if I could go back to your question about the Terry stop. The cornerstone of our, and I do believe that this Court could, who knows how this Court would come out in that situation, but I think in terms of our argument, the cornerstone. I know. Well, happily we don't have to decide that one today, but what I, the cornerstone of our argument is that when an individual is taken into custody, an individual is arrested on a probable cause, a probable cause arrest, that person, by virtue of being in that class of individuals whose conduct has led the police to arrest him on, based on probable cause, surrenders a substantial amount of liberty and privacy. But Ms. Woodley, that can't be quite right, can it? I mean, such a person, assume you've been arrested for something, the State doesn't have the right to go search your house for evidence of unrelated crimes, isn't that correct? That's correct, Justice Kagan. Doesn't have the right to go search your car for evidence of unrelated crimes. That's correct. But just because you've been arrested doesn't mean that you lose the privacy expectations and things you have that aren't related to the offense that you've been arrested for. That's correct. But what we're seizing here is not evidence of crime. What it is, is information related to that person's DNA profile. Those 26 numbers. Well, and if there were a real identification purpose for this, then I understand that argument. But if it's just to solve cold cases, which is the way you started, then it's just like searching your house to see what's in your house that could help to solve a cold case. Well, I would say there's a very real distinction between the police generally rummaging in your home to look for evidence that might relate to your personal papers and your thoughts. There's a very real difference there than swabbing the inside of an arrestee's  And I think that's what that person's CODIS DNA profile is. It's looking only at 26 numbers that tell us nothing more about that individual. Well, but if that's what you're basing it on, then you're not basing it on an arrestee. I mean, then the Chief Justice is right. It could be any arrestee, no matter how minor the offense. It could be just any old person in the street. Why don't we do this for everybody who comes in for a driver's license? Because it's very effective. But I think the difference there is these people are lawfully in custody, having been arrested based on probable cause.  Sotomayor All right. So now I see two lines of cases, okay? The Fourth Amendment, which says you can't do a search without a warrant and probable cause. And Sampson. And most of your brief argument was based on Sampson. As I read Sampson, it was a special relationship between the parolee or the probationary person, that line of cases. And the assumption being that they're out in the world, I think, by the largesse of the State. So the State has a right to search their home just as it would their cell, essentially. Why is that true for an arrestee? What creates the special relationship that permits you to intrude, search their person to solve other cases? Because you're going to have to tell me why searching their person is different than searching their home or car. Well, if I could start at the back end of your question, Justice Sotomayor. We're not suggesting, and this statute doesn't permit, the State or police to search an arrestee's home or his person beyond simply swabbing the cheek for the DNA. Now, in terms of the individual's relationship to the State, an arrestee is not that dissimilar. There is obviously a range of relationships with the State. Those of us who are out on the street, ordinary citizens are at one end. People who are imprisoned upon conviction are at the other end. But in terms of when an arrestee is physically in custody, he has a reduced expectation of privacy. And that's what makes, in our view, it makes this case more similar. To be sure, this is not Sampson. It's not one case in this Court's jurisprudence that's exactly like this. There's no other case but Sampson in that line that permits searches on this balancing. Well. So what I want to know is, what's the legal theory now? How far do we let the State go each time it has some form of custody over you in schools, in workplaces, wherever else the State has control over your person? Well, those are different situations, Justice Sotomayor. We're not suggesting that the police could swab a student for a DNA sample. We're talking about a special class of people who, by their conduct, have been arrested based on probable cause. Can I ask you this particular specific quick question? Yes, Justice. As I read this, this concerns people arrested for a felony considered a crime of violence, attempted crime of violence, burglary, or attempted burglary. Yes, Justice Breyer. And so we're not talking about people who are driving cars in traffic stops and all these other things. That's absolutely right. The only thing we have to decide is whether a person where there's probable cause to arrest a person for those four crimes, their fingerprints are all taken. Yes. And whether they also can take DNA. That's the issue. That's correct, Justice Breyer. Okay. Nothing else. Thank you. If there are no further questions, I'll reserve the remainder of my time for a break. Thank you, counsel. Mr. Dreeben. Thank you, Mr. Chief Justice, and may it please the Court. Arrestees are in a unique category. They are on the gateway into the criminal justice system. They are no longer like free citizens who are wandering around on the streets retaining full, intact Fourth Amendment rights. The arrest itself substantially reduces the individual's expectation of privacy. The arrestee can be searched and sent to arrest. His property, whether or not connected with a crime, can be inventoried. When he's taken into the jail situation, he can be subjected to a visual strip search. If he's admitted to the population of the jail, he'll be given a TB test and a thorough medical screen. These are not individuals who are like free citizens, and they are not like free  In my respect, arrestees are rarely arrested for the first time. They tend to be repeat customers in the criminal justice system. Up to 70 percent of arrestees have been previously arrested. Yes, but that doesn't mean, for example, that you can go into their house without a warrant. That is certainly correct, Chief Justice Roberts, and the reason for that is going into the house will expose a substantial number of highly private things to the view of the State. Taking a DNA sample is not of that character. It is far more like taking a fingerprint. Roberts, this is a factual question. I understand that your emphasis on the fact that it only looks at 26 loci and they are supposedly not connected in any way with other information. Does the sample that you retain, can it be evaluated more broadly? In other words, saying, well, the law says we only look at this 13, but we have the saliva. We want to look at all sorts of other stuff. Well, by law, the government under CODIS and the States cannot look at anything except identification information. The sample contains the entire genome. The sample cannot be looked at as a matter of law. And I think it's critical to this case for the Court to understand that if the Court concludes, as is probably correct, that the individual will retain a reasonable expectation of privacy in the genomic material that does not reveal identity, then additional Fourth Amendment scrutiny would be required before the government could make use of the rest of the genome. Here, it's making use of an identity indicator that is highly similar to fingerprints with one significant difference. It is far more accurate. When Respondent committed his rape, he wore a hat. Kagan.               Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. But it's not the same as the fingerprint, right? It's not the same as the fingerprint technology, and because the technology is different, it's used differently. Fingerprints you go in, you put in a fingerprint, there's identifying information, it comes back to you in five minutes, right? This, you put in something and Ms. Winfrey said it was 11 to 17 days. In this case, it's four months, and it doesn't seem to be used because the technology doesn't allow it to be used as the kind of routine identifier that fingerprints does. So am I wrong about that? You're not wrong, Justice Kagan, but the future is very close to where there will be rapid DNA analyzers that are devices that can analyze and produce the identification material in the DNA within 90 minutes, and the design of this program is to put them at the booking station so that DNA can be taken and within 90 minutes, that information is known. And in that circumstance, it will be highly relevant to the immediate release custody decision, which it already can play a role in. Breyer, I'm surprised. Then do you think the States are wrong? I mean, they all say in their brief in footnote 10, DNA identification database samples have been processed in as few as two days in California, and although around 30 days has been averaged. So I guess the technology is there now to process this in two days, not nine days. Yes, Justice Breyer. There's no question it can be done quickly because of the volumes. I'm not contending that today is the case. In the case of do you have any information, are there instances with fingerprints where returns have not come back for as long as 30 days, or are they all or almost all done in 5 minutes? Fingerprint histories tend to come back quickly, except if the prints are unrecognizable or unreadable. It's very significant, I think, that fingerprints are used for crime solution as well as a group of people. Before you get on to that, fingerprints have been taken, I believe, from people who are booked for offenses for many, many, many years. Isn't that right? Correct. And when did the FBI's APHIS system for comparing fingerprints by computer begin? That I cannot tell you, Justice Alito. It is now in use. It's in use both for identification and contrary to the representation of Respondent in his brief. Fingerprints are run against the latent fingerprint database, which reflects fingerprints from crime scenes. It returns about 50,000 hits a year. Well, the question that I had was this. If the constitutionality of taking fingerprints is dependent on the speed with which a fingerprint comparison can be done now by a computerized system, would that mean that the taking of fingerprints was unconstitutional back in, let's say, the 50s, when that wasn't possible and fingerprints could only be compared manually? No. I certainly do not think that it would have been unconstitutional at any point, because the State has a compelling interest in taking biometric identification information from the individual it has arrested and using it for a myriad of purposes, determining criminal history, attempting to solve crimes, funneling that information back to the individual. Mr. Dreeben, could I understand how this works exactly? The swab is taken, and if I understand, there's a database which is known offenders and there's a database which is kind of crime scene DNA, is that correct? That is correct. And when the swab is taken and it's put into the system, you check that against the crime scene DNA database, is that correct? That is the routine method under CODIS, yes. Do you check it, does Maryland check it against the known offenders database? I do not know precisely whether Maryland does that. The Federal system does not routinely do that. Upgrades to the software system will permit it to do that, and many States do it. Because that suggests that right now it's functioning as let's solve some crimes, which is a good thing, you know, that we should solve some crimes, but not as an identification device, because if it were an identification device, you'd be comparing it to the known offender database, not to the cold case database. I agree with that, and I think that in California, the brief for the States indicates that many States do that, and California itself uses it to resolve discrepancies in identity when a fingerprint comes back and it returns to multiple names or the fingerprint is not good enough to permit an identification. California crosschecks, so it does perform an identification function. And as I suggested, with the advent of rapid DNA, it's not that it's unconstitutional before rapid DNA, but rapid DNA will permit DNA identification to replace fingerprint identification because it's far more accurate and it has far more utility in the secondary purpose of fingerprints, which is to match them to latent prints and solve crimes. And this is highly relevant to both of the major purposes for taking DNA, crime solution and facilitating the release custody determination. Any judge who is looking at a bail case would like to know, I have a guy who's been arrested on Grand Theft Auto. He has no criminal history. Should I release him back on the street? Well, it's a first defense, he has family ties, maybe yes. If that's judge ---- Ginsburg-Miller, can you explain how it works mechanically? Because I understand, at least maybe this is just the Maryland statute, if you can't use the swab that's taken from the arrestee when he's arrested, can't be used, it's inadmissible, then you do it again. You do it, but when it does supply, it's probable cause, because you found out it's probable cause, he was a perpetrator of a rape 6 years ago, then you have probable cause and you get a warrant and do it again. What is the reason for the doubling of doing it twice? That serves an enhanced reliability function to ensure that there's no mix-up, and it provides an evidentiary function of permitting the new DNA match to be admitted in a sample that's taken under the warrant. It has nothing to do with undercutting the value of taking DNA on the spot, because as I was indicating, the judge who would know this defendant's DNA came back and returned a cold-case hit to a murder-rape, he's not such a good risk to be put back on the street. Roberts, that argument only makes sense if we're in your future world where it's 90 minutes, right? Because it depends on if we have a situation such as Maryland says 11 to 17 days, footnote whatever, an amicus brief says something else, but you're not going to put off the bail hearing for two weeks. No, but bail can be revoked, and the government will go back in and make a motion to revoke bail if new information emerges that indicates this individual is a danger to the community. And the whole point of this is that we're talking about arrestees, somebody who has taken a step into the gateway of the criminal justice system. The criminal justice system at that point has to deal with this person. It has to know who is this person, which includes what has this person done, so we know whether to release him, and if we keep him, in what situations do we keep him. Sotomayor, why doesn't it explain why you can't go into his home? Yes, it does. I mean, you know, if the whole issue is how dangerous is he, you should be able to go into his home, into his car, to any place he's visited, to just sort of run rampant in his life to make sure that he is not a bail risk. We are not asking for that, and I don't think that the Court's balancing test suggests that these two cases are equivalent. My first submission is that because we are talking about— Sotomayor, but you are, because what you are saying really is law enforcement need alone, without any suspicion whatsoever of another crime, permits you to take this information from the person and use it. I'm saying that because an arrestee is someone whose conduct has given rise to probable cause that he committed a crime, he's in a different position from ordinary citizens. And this Court does, as it did in Sampson and in Knight's, balance the expectations of privacy against the governmental interests. And here, the expectation of privacy is minimal in the cheek swab and the information obtained. It's identical. Sotomayor, in Sampson and Knight, you're dealing with people who are still subject to the criminal sentence. Well, they're differently situated in that respect, Mr. Chief Justice, and I will And there's no case that, on Respondent's side, that decides the case for him. The Court, I think, has treated the category of what he calls special needs cases, what the Court has called special needs cases, as dealing with suspicionless or warrantless intrusions on ordinary citizens. But the typical special needs case is one in which we say there's no law enforcement interest, that there's an interest other than the interest in solving crime. But we have a strong law enforcement interest with respect to people who are arrested based on probable cause. They are no longer similarly situated to other people. They can be deprived of their liberty. Their property can be searched upon entry into the jail. When you started, Mr. Dreeben, you started by saying, you know, they have a reduced expectation of privacy and we have important interests. You went right into free-form balancing. That's typically not the way we do it. If we said to you, look, you know, the way we do it is you need a warrant and if you do, there are some exceptions, then you have to put yourself into a well-recognized exception where you can search without a warrant. And that's especially the case when there's no suspicion whatsoever. How would you do it? How would you do it short of free-form balancing? What exception are you a part of? Dreeben, We're not asking for a new exception. What we're asking for is for the Court to apply what it called the key principle of the Fourth Amendment. It said that in Bell v. Wolfish. It said that in Martinez v. Wolfish, the key principle of the Fourth Amendment. Kennedy, is it your position that this is a search incident to an arrest? Dreeben, No, Justice Kennedy, it's not. That stands on its own doctrinal footing, but we do think the fact that Kennedy, why isn't this a search incident to an arrest? Dreeben, it is certainly a search. Kennedy, It's just like taking the pockets out and seeing what's in the person's overcoat and so forth. It's a search incident to an arrest. Dreeben, You can certainly look at it as an incident of the arrest. The Court's search incident to arrest cases have been bottomed on different justifications than the ones that we're advancing here. I'm entirely happy if you, Justice Kennedy, view it as an incident to arrest in that sense, because I think that it is appropriately viewed as something that the government has a compelling interest in doing once a person has been arrested, and that is knowing who that person is, which includes knowing what the person has done. And DNA does that in a far more powerful way than fingerprints has done. Scalia, But our search incident to arrest cases don't allow that. That's sort of the point. They allow you to search for firearms. They allow you to search for material that relates to the crime for which the person has been arrested. But you can't search the person for other stuff. Dreeben, That's inaccurate, Justice Scalia. A search incident to arrest allows a full search of the person for any destructible evidence, because a person who has been arrested has a tremendous incentive to destroy evidence. And I just want to come back to the point that the crime of arrest is only in Arizona v. Gantt, and it relates to cars. But I think it's critical to note that Respondent has conceded that an individual   who's picked up on Grand Theft Auto, and that individual knows that if he's convicted of Grand Theft Auto, he is going to have his DNA taken. But he also knows that he's committed a string of rapes. And if the government cannot take his DNA now, it will not connect him. May I complete the sentence? It will not connect him to those rapes. So he has a tremendous incentive to flee. The government has a tremendous need for this information at the time of the arrest to solve crimes, exonerate the innocent, and give closure to victims. Thank you. Roberts. Thank you, Mr. Dreeben. Mr. Chamagam. Thank you, Mr. Chief Justice, and may it please the Court. Maryland searched my client without a warrant in order to investigate crimes for which there was no suspicion. It is settled law that warrantless, suspicionless searches are presumptively unconstitutional. The State cited no- That is correct. And his custody was restrained. He was in a police station. That is also correct. Were handcuffs put on him during the transport process? Do you know? I don't know that the record indicates that. But they could have been. Yes. So his liberties were constrained in all those respects. He would have to take off most of his clothes to be subject to a pat-down search. They could look in his briefcase. Yes. Just to be clear, Justice Kennedy, we're not disputing the proposition that certain intrusions on privacy are permissible as to arrestees. But where we fundamentally disagree with the State and the Federal Government is with regard to the argument that this Court should take the rationale of Sampson v. California and essentially extend that rationale to the point of arrest. The government's- I think there is some merit to your argument in that regard. In Sampson, he was a parolee, and he actually, as I recall, signed a consent form- That is correct. As part of the probation. That is correct. That is right. But I'm curious as to why your position is that, let's say he's served his time, he's no longer subject to the criminal justice system, he's not on parole, he's not a probationer, you concede that the DNA evidence can be taken from him. I would concede, Mr. Chief Justice, that it can be taken at least while he is still under the supervision of the State, because after all, both Sampson and Knights were cases in which the individual was still under State supervision. That is to say, we're not arguing that at the point of conviction that the resulting lessened expectation of privacy extends in perpetuity as, say, a firearm or felon disability does. But what we are arguing is that to look at this Court's cases in Sampson and Knights, they both centrally depended on the proposition that it is the fact of conviction  What is the pertinence of the fact, I mean, this is not something that people are or can keep private. I mean, if you're in the interview room or something, you take a drink of water, you leave, you're done. I mean, they can examine the DNA from that drink of water. Well, Mr. Chief Justice. Doesn't that compromise the expectation of privacy? I think it's an open question as to whether or not there would be a search when DNA is collected from cells that could be said to have been involuntarily or voluntarily abandoned. And to the extent that there's an argument that there would still be a search, it would be based on this Court's reasoning in Skinner, where the Court suggested that the subsequent analysis of a urine sample would constitute a further invasion of the testimony of privacy interests. Robertson, My question was not trying to get at whether it's a search or not. It's whether it's getting at the reasonableness of the expectation of privacy that the — your DNA is protected from examination when it's left wherever you happen to have been. I would say two things about the privacy interests at stake here. First of all, there is an intrusion into the body, and that is what triggers the applicability of the Fourth Amendment here, to be sure. But it is also a relevant intrusion for Fourth Amendment purposes. But second, and perhaps more importantly, there is a legitimate expectation of privacy in the contents of an individual's DNA. And to the extent that this Court were to engage in balancing, we certainly think that that intrusion is a standoff. Roberts, Well, I mean, isn't that part of the question, whether there is a legitimate expectation of privacy in a person's DNA? Yes, and we think that the answer to that question is yes. Roberts, Well, I know, but you're simply just — I guess that's begging the question. And I'll just be repeating my question. How legitimate is it to you to expect privacy in something that the police can access without you even knowing about it, without any voluntary or involuntary, if you take a drink of water, if you leave behind a cigarette butt? Mr. Chief Justice, I heard Mr. Dreeben concede, as I think he must, that an individual retains a legitimate expectation of privacy in at least some of the information contained in the individual's DNA. And I suppose we can have a dispute about what types of information would qualify. But I think it really is settled that there are profound privacy concerns raised by the government's coming into possession of an individual's DNA. Scalia, I wouldn't have made the concession that you've made, that this case is about reasonable expectation of privacy. If there's no reasonable expectation of privacy, there's no search. But here there is a search. You have a physical intrusion. You pull a guy's cheek apart and stick a swab into his mouth. That's a search. Reasonable expectation of privacy or not? Justice Scalia, I didn't think I was conceding anything. But if I was, let me just be clear. We don't think that this Court should be engaging in balancing here. Indeed, that is really our principal submission. Alito, do you think the intrusion is worse? You just take a swab and you go inside somebody's cheek, as opposed to rolling fingerprints? Which is a greater intrusion? Well, we think that it is settled that intrusions into the body constitute a search for Fourth Amendment. I suppose that the argument could be made, Justice Alito, that there is a similar trespass on the person and therefore a search when fingerprints are collected. I would note parenthetically that in the first half an hour of this argument, we heard no explanation either by the State or by the Federal government as to their theory as to why fingerprinting is constitutional. Well, the thrust of a lot of what we've been presented with in the briefs and what we've heard this morning, and by the way, I think this is perhaps the most important criminal procedure case that this Court has heard in decades. The attorney for the State began by listing the number of crimes just in Maryland that had been solved using this. So this is what is at stake. Lots of murders, lots of rapes that can be solved using this new technology that involves a very minimal intrusion on personal privacy. But why isn't this the fingerprinting of the 21st century? What is the difference? If it was permissible and it's been assumed to be so for decades, that it is permissible to fingerprint anybody who's booked, why is it not permissible to take a DNA sample from anybody who's arrested? Justice Alito, we think that fingerprinting is distinguishable on three grounds. First of all, as a practical matter, an individual's DNA contains far more information and far more personal information than an individual's fingerprints. But as a doctrinal matter, we think that fingerprinting is distinguishable. Alito, as to the first, in our cases involving searches for where a urine sample is taken to determine drug use, the urine can be analyzed for all sorts of things besides the presence of drugs. And the Court has said in those cases, we're only going to consider that we're considering that this is a reasonable search with respect to the determination of whether the person has taken drugs, not all the other information that might be obtained from it. But that is because, Justice Alito, in those cases, cases like Skinner and Von Raab and Vernonia, there was a special need apart from the ordinary interest in law enforcement. And here it is clear that the primary purpose of the Maryland statute and, indeed, the similar statutes on the Federal and State levels was the ordinary interest in crime control, to solve unsolved crimes. And that is why those special needs cases are distinguishable, and I think that's why the State essentially disavows any reliance on the special needs doctrine. What are your other two distinctions? With regard to fingerprinting, we think that notwithstanding the physical intrusion involved with taking an individual's fingers and putting them on the pad, that the better view is that fingerprinting is not a search. And to the extent that this Court has addressed the question, it has suggested that fingerprinting is not a search because an individual has no expectation of privacy in their fingerprints because their fingers are constantly being public. Breyer, I would like to get a complete answer to what Justice Alito and Justice Kagan both were asking, I think. I mean, to summarize that, if I look in terms of intrusion, I'm not talking legally, I'm talking practically. It doesn't seem to me, I can argue that it's certainly a much lesser intrusion than fingerprints. You have to stand there, have the thing rolled, you have to stick out your tongue or something. I mean, it's hard to say it's more, for me, I'm not saying for others. Accuracy, it's much more accurate, and that doesn't just help the defendant. There's a whole brief here filed by the victims that have case after case where people spent 5 years in prison wrongly and where this system and the codex helped victims avoid being arrested and sent to jail when they were innocent. So it works both ways. So, one, it's no more intrusive. Two, it is much more accurate. And three and four and five, how it's different and worse in practice is what I'd ask you to summarize. And by the way, when you talk about what information you could get out of it, there's a brief filed by leading scientists in the field. And I came away from the brief thinking there isn't much more information because fingerprints can be abused, too. Of course, you can learn loads through fingerprints. Photos? Try photos. My God, you could learn a lot. Who he was, who recognized, you know. So all these things could be abused. But I came away from that brief, frankly, to think, well, in terms of the possibility of abuse, it's there. But these other things, photos, too. Now, you tell me, in light of that hostile question, I would like you, no, I'd like you to tell me, okay, it's different from fingerprints and worse because of one, two, three, and I'll write it down, I'll remember it, I promise. Sotomayor, he gave us one and two, I've been waiting for three. Can we drop the shoe? Let me, I will gladly get to three with regard to fingerprinting, and then I'd like to say a word about balancing in the event that the Court reaches it. Obviously, we don't think that balancing is appropriate here because we don't think that the Special Needs Doctrine is applicable and we don't think that Sampson should be extended to arrestees. But with regard to fingerprinting, the other reason why we think fingerprinting is different, above and beyond the fact that we think that the better view is that fingerprinting is not a search, is because fingerprinting, as it is currently practiced, does serve a special need. The primary purpose of fingerprinting is to identify an individual who is being taken into the criminal justice system. Kagan, that seems to me a real distinction in this case as it's been litigated. I take what the government is saying as something like give us 5 years and those won't look very different. In other words, we'll be able to do in 5 years' time exactly what we can do with fingerprinting, except it will be, as Justice Breyer says, more accurate. So we're just about 5 years ahead of that, so give us a break. And my response to that would be that under the Special Needs Doctrine, what is relevant is not how a system could conceivably operate. What is relevant is the primary purpose behind the program at issue. So if the government were to come back in 5 years' time with a DNA testing program, the primary purpose of which was pretrial supervision or identification, one of these other purposes that is being offered, then sure, the analysis would be different. That is simply a consequence of the fact that the Special Needs Doctrine, unlike the rest of the Fourth Amendment, looks to purpose, namely the purpose of the program at issue. Kennedy, a person has been arrested for a felony and is in custody. Do the police, does the justice system have an interest in knowing whether that person committed other crimes? The justice system always has an interest in law enforcement and solving crimes, and we certainly don't dispute that proposition. But what we do dispute is Mr. Dreeben's principal submission to this Court, which is that simply because law enforcement can do certain things to arrestees, it can do others. The primary thing is law enforcement. Kennedy, my question is whether or not the police who have John Doe in custody for a felony have an interest in knowing at the outset or within a few weeks' time whether or not that person has committed other crimes. The difference between an arrestee and an ordinary citizen, Justice Kennedy, is that as to an arrestee, the police have probable cause to believe that the arrestee committed a particular offense. But they also have a reason for keeping him in custody. And my question is, do they have an interest and a legitimate interest in knowing if that person has committed other crimes? They have that interest, but if they want to investigate other crimes, they have to do what they would have to do as to an ordinary citizen. They have to have a warrant or some level of individualized suspicion. Roberts. Roberts. Two different interests. One is we want to solve unsolved crimes, and the other is we want to be sure we have someone in our custody and we want to be sure, before he's released back into the community, that he is a person who's committed five violent crimes before that. Now, your brief says, well, their only interest here is the law enforcement interest. And I found that persuasive because of the concern that it's going to take months to get the DNA back anyway, so they're going to have to release him or not before they know it. But if we're in a position where it now takes 90 minutes or will soon take 90 minutes to get the information back, I think that's entirely different, because there you can find out whether it's just tied in with the bail situation, do you want to release him or not. The touchstone of the analysis under the Special Needs Doctrine is what was the primary purpose of the program at issue. And there is no evidence that pretrial supervision was a purpose of any of these judgments. Roberts Well, but that's because we're not yet at the situation where it takes 90 minutes. Sure, it's not going to do you any good if it's taking 4 months or whatever it took in this case, but if it's at the point where it's 90 minutes, it would be critical to make that determination. Well, Mr. Chief Justice, as I said to Justice Kagan, the constitutional analysis may very well change at a later point. But I think it's important to underscore that neither the State of Maryland nor the Federal Government identifies a single instance in which a pretrial supervision decision in their jurisdictions was altered as a result of the DNA test.  Well, let's put it this way. Let's say the judge, the magistrate, is going to make a bail determination and he says, well, it's important to me to know whether you're going to commit another crime. So we're not saying you have to give a DNA sample, but it will enter into my calculation if you refuse to do it. Well, outside the programmatic context, ordinary Fourth Amendment rules would apply. And the ordinary rules would apply. Well, what does that mean? Is that okay or not? Well, I think in that circumstance where there is no individualized suspicion, a search cannot occur. And in a rest state stand. Well, isn't that sound just like a breathalyzer? You're pulled over. They say we want you to take a breathalyzer test. It says you don't have to, but if you don't, your license is suspended for 6 months or whatever. Why isn't that the same thing? Well, you know, I will say that the one thing that is slightly different about your hypothetical, Mr. Chief Justice, is that the analysis might be somewhat different where what you're talking about is a condition of release. I think you would trigger the unconstitutional conditions doctrine and the analysis might operate somewhat separately, somewhat differently. But just to conclude with regard to my answer to Justice Kennedy and then to get back to the rest of Justice Breyer's question, Justice Kennedy, with regard to arrestees, the intrusions on privacy that are permissible are all intrusions that relate to the arrest. So to take the two principal examples, the search incident to arrest doctrine, which you mentioned, and searches associated with an individual's continued detention, so the strip-searching example, those doctrines have discrete justifications that limit their scope. So the search incident to arrest doctrine permits searches for officer safety to prevent destruction of evidence and, at least in the vehicular context, to search for evidence related to the offense of arrest. Now, none of those rationales apply here, and I would note parenthetically that in Schmerber v. California, this Court suggested that the search incident to arrest doctrine would not permit searches into the body. Kennedy, but we're also talking about identity. I assume that in Maryland and in a number of States, the time between release on bail and return for trial is more than 4 months. And if it's found as an identity matter that this person has a criminal record or that they're suspected of serious crimes, that is a mandatory ground for reconsideration of bail. And you say there's no interest in that. I'm not disputing that the government has an interest in knowing about prior offenses that an individual has committed. What I am simply saying is that the primary purpose of DNA testing, unlike fingerprinting, is to investigate unsolved crimes. That is the ordinary interest in law enforcement. When the government is indicating that the person has a record, we have this person and now we check the fingerprints to find out if he has a prior record. That's different from to find out if he has committed a crime that we don't know about. But are fingerprints used to determine whether the person has a prior record? Fingerprints taken upon booking are primarily used for the purpose of identification. And by identification, I would include determining whether the individual had a prior criminal record, because as IAFIS is currently structured, that is information that is returned once there is a hit for that initial search. Now, to be ---- Alito, what was the purpose of fingerprinting before it was possible to make fingerprint comparisons by computer? Well, I think fingerprinting really has, from the outset, served the purpose of identification. Because fingerprinting really came into being approximately 100 years ago, because  Now, to be sure, fingerprinting does serve a law enforcement purpose as well. As Mr. Dreeben indicated, there is a latent fingerprint database that roughly corresponds to the ---- Well, I would assume that before it was possible to do computer searches, the way in which it, in fingerprinting, established identification, what it did in that respect was to identify the person arrested on this occasion, so that if the person was arrested again, then the police would know that it was the same person. There was no way of, no practicable way of taking the fingerprints of somebody who was booked and determining whether that person, you didn't have anything to compare it to. And certainly, you couldn't do it manually. That is true. But again, the purpose of fingerprinting, as it developed over time, was identification in the sense that as fingerprints were being collected, individuals could proceed to be identified. Can we go back to the---- You can go back to the DNA system and say, well, in 2001, you've arrested, you've arrested Mr. X, and then a year later, you arrest somebody else, and you know it's Mr. X again. And DNA can do exactly the same thing, except more accurately. But I think it's important to realize, Justice Alito, that at least as the DNA system is currently constituted, when an arrestee's profile is prepared, it is compared against the offender and arrestee indices, not the forensic index. And indeed, as we understand it, and I think Mr. Dreeben's discussion of this is broadly consistent with this, at least on the Federal level, it is not permissible to take that profile and search it against the offender and arrestee indices. Now, that may very well occur in certain States. We don't have any reason to believe that that is what takes place in Maryland. But again, this is really what distinguishes the way in which the Federal system     Breyer. Breyer. And so I don't want to make you lose this, because I have a confusion that you can clear up. There is something to what you say. I see what you're saying. But what does this word identification mean? It's used for identification, that we have a person, he's been arrested, he writes his name down, Mr. Smith, maybe he's lying. We have his picture. Well, his picture is pretty good. If he turns up in the bar somewhere in the future, we can see that's awfully good. And now you say, well, what is fingerprinting doing that photos aren't doing in terms of identification? What does it do in terms of just identification? Sure. What does it do? We think it means determining or confirming the identity of an individual. What does that mean, confirming his identity? We have, you mean what? What exactly? Confirming, for instance, in this case, that the individual in the government's custody was Alonzo King. Oh, really? I mean, do you think the fingerprints, where do you go to find out if he's Alonzo King? A lot of people have never had their fingerprints taken before. Well, but 73 million people are in the criminal record. That's what it's for, to determine what his name really is. And his criminal, and to be sure, his adjudicated criminal history. Ah. So wait, wait. You want to determine what his name really is plus his adjudicated criminal history. And here we have the DNA, which I guess might or might not help determine what his name really is, and with criminal history it does about the same. And also fingerprints are sometimes used to, for unsolved crimes. And here they're sometimes used for unsolved crimes, but your point really is more for unsolved crimes. I got it wrong. Justice Breyer, no. I think with respect you have it. With regard to DNA testing, a DNA profile, at least as the Federal system is configured, is compared against the forensic index. That is the index of samples from unsolved crimes. And so that is really in contradistinction to how the fingerprint database  Sotomayor, I'm really worried about the question you haven't satisfied me with, which is I agree completely that today it's used primarily and almost exclusively for purposes of solving other crimes. But let's — is this the question that I think one of my colleagues asked? Is that only because technology hasn't moved fast enough? You said we have to look at the constitutional principles 5 years from now when they will use it to pull up a guy's criminal history, not unsolved crimes, but criminal history. Get to that day. Sure. Well, Justice Sotomayor — Tell me what the — why you would then say that would still be unconstitutional. Justice Sotomayor, assuming that this Court does not accept the proposition that arrestees are somehow subject to a lessened expectation of privacy. Right. Let's assume we go under normal Fourth Amendment. You need probable cause to search. Right. And the only other potentially applicable exception to the principle that warrantless suspicionless searches are unconstitutional is the special needs exception. And that exception looks to the primary purpose of the program at issue. And the mere fact that DNA testing could be used for other purposes wouldn't necessarily be dispositive of the inquiry. If the primary purpose of DNA testing is still to investigate unsolved crimes, the program would still not qualify under the special needs — Just suppose, I mean, I guess the question is, would this be unconstitutional? It's not the world we're living in now, but let me — 10 years from now, the government says we're really switching over to a fingerprint system, to a DNA system. And what that system is going to allow us to do is it's going to allow us to identify and it's going to allow us to bring up the old criminal history, and it's going to allow us to see whether there are also unsolved crimes that we can tag to this person and discover that he's really, really dangerous. All right? And so the government puts that system into effect. Is it constitutional? I think that it could be. And that would simply be because you would have a system where DNA testing is essentially being used as fingerprinting is being used today. But again, I don't think it could be— Sotomayor, I was interested in a broader thought process, actually. It's not giving it to me, which is there is something inherently dangerous about DNA collection that's not the same with fingerprinting. Well, there is, and that gets me back, finally, to the rest of Justice Breyer's question from a few minutes ago, because Justice Breyer had kind of asked how the And so I just want to say a word about the relevant privacy interests and the relevant governmental interests, and to explain why we think that the relevant privacy interests outweigh those governmental interests. On the privacy side of the ledger, we certainly believe that there are profound privacy concerns associated with the government's collection of an individual's DNA. And leaving aside the question of how much personal information is contained in the 13 loci, and we certainly think that there is significant personal information even as to those loci, I don't think there can be any dispute that when you evaluate the entirety of an individual's DNA, there is a great deal of personal information contained there. And in our view, that has to be taken into account when engaging in balancing. Now, the government's response to that is essentially the just trust us defense, namely that the government is not looking at all of that information. It is only looking at a certain subset of that information. But that has never been how this Court has analyzed privacy interests, at least outside the special needs context. Probably the closest analog is this Court's decision in Kilo v. United States, where the Court said that it was of no moment that the heat-sensing device that was at issue in that case did not detect any information about the intimate details of activities within the home. Roberts, you disclose all of this intimate private information when you take a drink of water. And leave the glass behind. But, Mr. Chief Justice, as I said at the outset, we believe that there might still be, indeed we think the better view under this Court's cases, is that there would still be a Fourth Amendment search there. The only difference would be that you don't have the intrusion into the body that makes the question of whether or not there was a search here an easy one. Now, I want to say just a word about the government. Alito, someone has a bloody shirt and throws it away in the trash in a public trash can along the street. You're saying that the police can't analyze that without a search warrant? The argument would be that the subsequent analysis of the DNA nevertheless still constitutes a search. And the most significant decision on this issue to date is the Fourth Circuit's decision in United States v. Davis, which I would encourage you to look at if you're interested in this issue, because it holds that the extraction of the DNA from an item that was lawfully in the government's custody still constitutes a search. Let me say just a word, though, about the governmental side of the balance here, because I think this is important. Ms. Winfrey started with the statistics about the efficacy of DNA testing of arrestees. But our submission is simply that when you look at the relevant subset of cases, namely individuals who have been arrested but who are not subsequently convicted of the offense of arrest, the law enforcement value of DNA testing is relatively modest. My understanding is that there have been ---- Alito, your client was convicted of the offense of arrest. That is correct. And it was a serious offense, punishable by up to 10 years' imprisonment. Well, my client ---- Isn't that correct? And he was sentenced to 4 years. That is ---- my client was convicted of the crime of arrest, to be sure. But under the Maryland statute, that crime was not a serious enough crime to qualify for DNA collection at that point. But for Fourth Amendment purposes, do you think that it is permissible to take a DNA sample from someone who is convicted of an offense that would qualify as a felony under common law? We think that it would be permissible to collect DNA from any individual who has been convicted and is subjected to the continued supervision of the State, and that is simply because those individuals have a lessened expectation of privacy. But just to get on the table ---- But they don't require custody of the State. Does the government have to destroy it? They served their time, their privileges have been restored. We don't think in that circumstance, Justice Ginsburg, that the government would have to destroy the DNA sample. Does a felon who has been arrested have a reduced expectation of privacy at the time of arrest? I'm sorry. A felon who has been ---- Does a person who has been arrested for a felony have a reduced expectation of privacy at the time of his arrest? I would not say that that person has a reduced expectation of privacy. What I would say is that there are certain intrusions on privacy, some of which are quite substantial, that are permissible because there are justifications unique to the arrest. So in Florence, this Court permitted the strip search of an individual who is being in need of ensuring prison safety and preventing contraband from being introduced into the prison. Thank you, counsel. Ms. Winfrey, you have three minutes remaining. On the question of rapid DNA, the FBI estimates that we're about 18 to 24 months away from that world, and I would cite the National District Attorney's Association amicus brief on page 20 where it discusses the ---- that this is not science fiction. So we're very, very close to that. And I wanted to just address a couple of the questions that arose during Respondent's presentation. Justice Kennedy, the State does have a compelling need and a compelling interest in knowing who is in its custody, and arrestees do not have a legitimate expectation of privacy in their identity. We have a legitimate and compelling need to identify suspects and to aid in solving crimes. And our definition of what identification is is somewhat broader than Respondent's. It's not just what his name is and what his face is and what his fingerprints show. It is that CODIS DNA profile, those 26 numbers. So in our view, that's a broader definition of identity. And I wanted also just finally to address Justice Alito's question. This is the fingerprinting of the 21st century, but it's better. Typically, DNA evidence is used to identify rapes and murderers. Fingerprints typically do not solve those kinds of crimes. And if the primary purpose of fingerprinting is just to identify, it also is used fingerprinting now is used, the prints are compared against the latent database in IAFIS, and they are used to solve crimes, but they typically don't solve the kind of crimes that we're talking about here, and it wouldn't have been solved in Mr. King's case. Roberts. How can I base a decision today on what you tell me is going to happen in two years? You say in two years we'll have this rapid DNA available, but we don't now. Don't I have to base a decision on what we have today? Well, that's really only one component of our argument, Mr. Chief Justice, that certainly with respect to a bail determination, we'll be able to make it more rapidly at the time that rapid DNA comes into effect. But if we believe that the purpose of it has much to do with whether it's legitimate or not, you can't demonstrate that the purpose is immediate identification of the people coming into custody. You just can't demonstrate that now. Maybe you can in two years. The purpose now is the purpose you began your presentation with, to catch the bad guys, which is a good thing. But, you know, the Fourth Amendment sometimes stands in the way. It has a corollary purpose, Justice Scalia. What we're suggesting and arguing is that solving crimes, to be sure, is the key component, but in solving crimes and connecting an arrestee to a crime that's unsolved informs a judge's determination about whether to release that individual. And as Mr. Dreeben said, bail modifications can happen. They do happen all the time. And in Maryland, it's going to be happening before rapid DNA. Right now, we're able to make that determination in a period between 11 and 17 days. So we're not asking you to base your decision on the futuristic world, which is really only two years out with rapid DNA anyway. But we can make those bail determinations now. And, in fact, they're important for where we house prisoners and how we supervise them in custody. Thank you, counsel. The case is submitted.